# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MICHAEL C., CHERITA C., KIMBERLY W.,
ALEXIS C. and IAN W.,
      Plaintiffs,

v.                                                                   Case No. 05-C-650

DANA GRESBACH, DENISE REVELS ROBINSON
and HELENE NELSON,
      Defendants.

## DECISION AND ORDER

Three adult plaintiffs, parents and step-parents of the two minor plaintiffs, step-siblings Ian W. ("Ian") and Alexis C. ("Alexis"), and the minor plaintiffs, bring this action under 42 U.S.C. § 1983. They seek damages against defendant Dana Gresbach, a social worker, alleging that she subjected each of the minor plaintiffs to an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments and violated all plaintiffs' rights to due process of law in violation of the Fourteenth Amendment. Plaintiffs also assert official capacity claims against Gresbach and two of her superiors, seeking declaratory and injunctive relief, and raise supplemental state law claims. Before me are plaintiffs' motion to strike, plaintiffs' motion for partial summary judgment, and defendants' motion for summary judgment.

### I. FACTS

Alexis and Ian attended the Good Hope Christian Academy ("Good Hope"), a private elementary school in Milwaukee. In February 2004, a relative reported to the Bureau of Milwaukee Child Welfare ("MCW"), a subagency of the Wisconsin Department of Health and Family Services ("DHFS"), that Michael hit Ian on the wrist with a plastic stick. MCW assigned Gresbach to investigate. Gresbach visited Good Hope and advised school principal Cheryl Reetz that she was investigating an allegation of child abuse and that she wished to interview

Ian and Alexis. Reetz asked whether she should first contact Ian and Alexis's parents, and Gresbach discouraged her from doing so. Reetz also asked if she could observe the interviews, and Gresbach said that she could not.

Gresbach first interviewed Ian, who told her that Michael sometimes hit him with a flexible stick. Gresbach examined Ian's wrist and saw no marks. She then told Ian to lift up his shirt. Ian did so and Gresbach examined him and found no evidence of injury. Gresbach then interviewed Alexis, who told her that her parents sometimes gave her "whoppings," but that they had not caused marks or injuries. (Pls.' Mot. for Summ. J. Ex. 4 at 3.) Gresbach told Alexis to pull down her tights, and Alexis did so.[1] Gresbach examined her and again found no evidence of harm. Gresbach took no further action regarding the matter.

I will state additional facts in the course of the decision.

## II. MOTION TO STRIKE

Plaintiffs move to strike the affidavits of Gresbach's coworkers submitted in support of Gresbach's claim of entitlement to qualified immunity. The affiants aver that they would have handled the matter as Gresbach did. Plaintiffs argue that defendants failed to timely disclose the affiants' identities and that the affidavits contain inadmissible opinion testimony. Defendants respond that they only recently became aware of the names of the affiants and that the affidavits are factual in nature. While I am skeptical as to whether the affidavits present facts as opposed to opinions, I will deny plaintiffs' motion to strike. As discussed below in determining whether Gresbach is entitled to qualified immunity, I find the affidavits of little value.

---

[1] It is not clear whether Gresbach required Alexis to take off additional clothes. Gresbach stated in her deposition that she probably checked Alexis's arms, back, legs and torso. (Glinski Aff. Ex. B at 121.)

### III. MOTIONS FOR SUMMARY JUDGMENT

**A. Standard**

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a dispute to be "genuine," the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be "material," it must relate to facts that might affect the outcome of the suit under the governing law. Id.

In evaluating a motion for summary judgment, I draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Where, as here, both parties have moved for summary judgment both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983).

**B. Fourth Amendment Claims**

**1. Applicable General Principles and Nature of Claims**

Plaintiffs may recover under § 1983 if they can establish that a defendant violated their constitutional rights under color of state law. Abraham v. Piechowski, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998). Ian and Alexis claim that Gresbach violated their Fourth and Fourteenth Amendment rights both by interviewing them and by examining their bodies under their clothes, and they seek summary judgment on the issue of Gresbach's liability for the latter conduct. Gresbach denies that she violated their rights and also argues that she is entitled to qualified

immunity. She moves for summary judgment on Ian's and Alexis's Fourth Amendment claims. In addressing the parties' motions, I first determine whether Gresbach violated Ian's and Alexis's constitutional rights. See Saucier v. Katz, 533 U.S. 194, 201 (2001) (stating that the first step in deciding whether an official is entitled to qualified immunity is determining whether the facts taken in the light most favorable to the claimant establish a violation of a constitutional right).

The Fourth Amendment protects "[t]he right of the people to be secure in the persons, homes, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The protection provided in the amendment extends to children subjected to searches and/or seizures by social workers and to the schools in which they are enrolled. Doe v. Heck, 327 F.3d 492, 509 (7th Cir. 2003).

In Heck, the plaintiffs alleged that based on a report that a private school principal was corporally punishing students, MCW social workers visited the church that housed the school and asked to interview a child who had reportedly been paddled. Id. at 502-03. The principal and the church's pastor refused to permit the interview. Id. at 503. The social workers then called the police, who directed the principal and the pastor to allow the interview, which they did. Id. The Seventh Circuit concluded that the social workers had unreasonably searched the church and unreasonably seized the child. Id. at 510. The court held that child protection workers could only enter a private school and interview a child without the principal's consent if they had probable cause, entered pursuant to a court order or if there were exigent circumstances. Id. at 513. The court further stated that "to the extent Wis. Stat. § 48.981(3)(c)(1) [which permits a child welfare worker to interview a child "at any location without permission from the child's parent, guardian, or legal custodian if necessary to determine if the child is in need of protection or services"] authorizes government officials to conduct an

investigation of child abuse on private property without a warrant or probable cause, consent or exigent circumstances, the statute is unconstitutional." Id. at 515-16. However, because the court found the statute to be facially valid at the time that the social workers acted, the court held that the social workers were entitled to qualified immunity. Id. at 516. Nevertheless, it noted that: "We now make it clear that it is patently unconstitutional for government officials to search the premises of a private or parochial school and/or seize a child attending that school without a warrant or court order, probable cause, consent, or exigent circumstances." Id. at 517.

In the present case, Gresbach did not have a court order and defendants do not assert that she had probable cause or that exigent circumstances existed. However, defendants argue that she acted reasonably because Reetz, who stood in loco parentis with respect to the children, consented to her actions. Ian and Alexis do not dispute that Reetz had the authority to permit Gresbach to interview them but argue that whether she voluntarily consented to the interviews is a question of fact for a jury and that Reetz did not consent to Gresbach's under the clothes examinations as a matter of law.

### 2. Standards for Determining Consent, Scope of Consent and Voluntariness of Consent

A search or seizure does not violate the Fourth Amendment if an authorized person consents to it. A person can manifest consent through actions as well as words. United States v. Walls, 225 F.3d 858, 863 (7th Cir. 2000) (stating that by opening a door and stepping back to allow police entry, a defendant can consent to the police entry into his home). The permissible scope of a search made lawful by consent is limited by the scope of the consent. Florida v. Jimeno, 500 U.S. 248, 251 (1991). In determining the scope of consent, a court asks, "what would the typical reasonable person have understood the scope of consent to be

by the exchange between the [official] and the [consentor]." Id.; see also United States v. Breit, 429 F.3d 725, 729 (7th Cir. 2005). When the consentor expressly limits the scope of her consent, the official must limit her action accordingly. Breit, 429 F.3d at 730.

When the lawfulness of an official action depends on consent, the consent must be "in fact voluntarily given and not the result of duress or coercion express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). A § 1983 plaintiff challenging the voluntariness of consent bears the burden of establishing involuntariness. Valance v. Wisel, 110 F.3d 1269, 1279 (7th Cir. 1997). Courts have developed the law of voluntary consent primarily in criminal cases, but such law is also applicable in civil cases such like the present case.[2]

Generally, the test for determining whether consent is voluntary is whether a reasonable person in the consentor's position would believe that she is free to refuse consent. United States v. Drayton, 536 U.S. 194, 206-07 (2002); United States of America v. Wade, 400 F.3d 1019, 1022 (7th Cir. 2005); see also Illinois v. Rodriguez, 497 U.S. 177, 188 (1990) (stating that factual determinations relating to the lawfulness of a search or seizure are judged by an objective standard). In applying this test, a court looks to whether the official took an action, such as detaining the consentor, or made a statement that would lead a reasonable person to conclude that she could not freely refuse consent.[3] See Drayton, 536 U.S. at 206; Wade, 400

---

[2]Defendants argue that the standard for determining voluntariness is less stringent in civil than in criminal cases and cite E.Z. v. Coler, 603 F. Supp. 1546, 1556 (N.D. Ill. 1985). However, I find that decision's analysis unpersuasive and reject it. I note also that the Seventh Circuit has disapproved of it. Darryl H. v. Coler, 801 F.2d 893, 907 (7th Cir. 1986). Nevertheless, the context in which an official acts may factor into the voluntariness determination. For example, a court may view a claim of coercion involving a police officer with a gun differently than a claim of coercion involving a social worker. Nevertheless, if a social worker coerces consent, a court must find such consent involuntary.

[3]An official may attempt to rebut a claim of involuntariness by showing that she advised the consentor of her constitutional right to refuse consent, but such advisement is generally not required. See United States v. Sandoval-Vasquez, 435 F.3d 739, 744 (7th Cir. 2006).

F.3d at 1022. Because voluntariness is determined based on a reasonable person standard, it is treated as a question of law. Wade, 400 F.3d at 1021; see also Ornelas v. United States, 517 U.S. 690, 696-99 (1996) (holding that the ultimate question of whether historical facts amount to "reasonable suspicion" and "probable cause" should be treated as questions of law); United States v. D.F., 115 F.3d 413, 418 (7th Cir. 1997) (applying Ornelas to a voluntariness determination).

Courts often do not articulate the voluntariness test as I have.[4] Rather, they quote Schneckloth to the effect that voluntariness "is a question of fact dependent upon the totality of the circumstances," see, e.g., Sandoval-Vasquez, 435 F.3d at 744 (citing Schneckloth, 412 U.S. at 227). However, a careful reading of Schneckloth indicates that a more nuanced understanding of the above quotation is that voluntariness is heavily dependent on the surrounding facts and circumstances. See State v. Phillips, 218 Wis.2d 180, 193 (1998) (stating that:

> In holding that voluntariness of consent is a question of fact, the . . . Court in Schneckloth primarily relied on its conclusion that a proper analysis of the issue does not turn on per se rules or bright-line tests, but rather is very fact-specific and based on the totality of circumstances involved in each case.)

Thus, in a civil case, while determining voluntariness may require a jury to resolve factual questions such as whether the official's or the consentor's version of a conversation is more credible, Gower v. Vercler, 377 F.3d 661, 667 (7th Cir. 2004), where the facts are largely undisputed, the ultimate question must be resolved by the court, Wade, 400 F.3d at 1021 (stating that credibility determinations underlying a finding of voluntary consent are issues of

---

[4] In the context of a motion to suppress evidence, whether voluntariness is a question of fact or law likely matters little because a judge makes the decision regardless. This may be why few courts have examined the issue. However, in a civil case, whether voluntariness is a question of fact or law becomes more important because the outcome may determine whether voluntariness is decided by a jury or a judge.

fact but that the ultimate voluntariness finding is an issue of law); Ornelas, 517 U.S. at 699; see also Drayton, 536 U.S. at 206; Rodriguez, 497 U.S. at 188 (both indicating the objective nature of the voluntariness inquiry).

Courts also often state that voluntariness depends in part on the particular characteristics of the consentor, such as age, intelligence and education. See, e.g., Sandoval-Vasquez, 435 F.3d at 744. However, commentators have noted, and a review of the cases confirms, that individual characteristics affect the voluntariness determination only when the consentor is uniquely vulnerable in a way recognizable to a reasonable official, see United States v. Grap, 403 F.3d 439, 443-44 (7th Cir. 2005), and the official exploits the vulnerability to obtain consent, see Marcy Strauss, Reconstructing Consent, 92 J. Crim. L. & Criminology 211, 222-23 (2001).

### 3. Application of Standards

The only evidence in the record concerning Gresbach's conversation with Reetz are Gresbach's and Reetz's depositions and Reetz's affidavit. Gresbach and Reetz's recollections of the conversation are largely similar. Gresbach states that she gave Reetz her card and said that she was investigating a claim of abuse. She states that she did not specifically ask Reetz for permission to see Ian and Alexis but said that she wanted to see them. She states that Reetz inquired about contacting the children's parents and that she discouraged her from doing so. She states that Reetz asked how she ordinarily conducted interviews with children and that she responded that investigators generally spoke to the children before speaking to others. She states that Reetz asked her whether she could sit in on the interviews and that she said no. She states that she did not disclose to Reetz her plan to physically examine the children for signs of abuse.

Reetz states that when she arrived, Gresbach stated that:

> she would like to see Ian and Alexis, that she was here to see them. I asked if
> I needed to call the parents and the response was no so I went and got the
> students one at a time and then asked if I could go in and she said that I didn't
> need to.

(Glinski Aff. Ex. A at 13.) Reetz states that Gresbach did not explain the exact nature of the investigation. She states that she assumed that Gresbach had the right to talk to the children with or without her permission, although Gresbach did not say this. When asked whether Gresbach said anything that caused her to think that she couldn't refuse Gresbach's request to interview the children, Reetz responded, "[j]ust the fact that I asked if I should call the parents and she said I didn't need to so I'm, my assumption then was that the parents didn't need to be alerted that they were trying to see the children prior to the parents having knowledge." (Id. at 14-15.) Reetz states that Gresbach did not prevent her from calling the children's parents and behaved in a pleasant and professional manner.

Based on the foregoing evidence, no reasonable factfinder could conclude that Reetz did not consent to Gresbach's request to interview the children. Neither Gresbach nor Reetz recalls precisely how Gresbach inquired about seeing the children, but both agree that Gresbach communicated to Reetz her desire to speak with the children. By retrieving the children for the interviews, Reetz consented to the request, albeit non-verbally. See Walls, 225 F.3d at 863.

Further, Reetz's consent to Gresbach's request to interview the children was voluntary. Gresbach did nothing that would have "indicated to a reasonable person [in Reetz's position] that . . . she" was not free to refuse the request. See Drayton, 536 U.S. at 206.[5] Gresbach conversed with Reetz in Reetz's office and communicated in an amicable and professional

---

[5]I note that, even if I viewed the ultimate question of voluntariness as one of fact – which, as I have indicated, I do not – I would reach the same result. No reasonable jury could conclude that Reetz involuntarily consented to Gresbach's request to interview the children.

fashion. She employed no coercive tactics and did not repeatedly ask to conduct the interviews.

Nothing in the record suggests that Reetz was uniquely vulnerable or that Gresbach exploited her. Plaintiffs suggest that the fact that Reetz asked Gresbach questions about child abuse investigations indicates a vulnerability. I disagree. The fact that Reetz was unfamiliar with the law of child abuse does not mean that she was mentally or emotionally vulnerable. Nor can I infer involuntariness from the fact that Gresbach did not tell Reetz that she did not have to consent to her request to interview the children. Whether an official informs a consentor of her right to refuse is only one factor in the voluntariness test. See Schneckloth, 412 U.S. at 227. While an official's misrepresentation can cause consent to be involuntary, Gresbach did not misrepresent her authority. While Gresbach's and Reetz's statements are sometimes confusing, they indicate that Reetz asked whether she could permit Gresbach to interview the children without calling their parents and whether she could witness the interviews. Gresbach responded accurately to the first question and although she should not have told Reetz that she could not witness the interview, she never intimated that Reetz could not withhold consent altogether if she was uncomfortable with Gresbach interviewing the children alone. Thus, the facts of the present case are unlike those in a submission to authority case, see Strauss, supra, at 224-25, and indicate that Reetz's consent was "in fact voluntarily given, and not the result of duress or coercion, express or implied," Schneckloth, 412 U.S. at 248.

I turn now to the question of whether Reetz authorized Gresbach to examine the children's bodies. The evidence unequivocally establishes that Gresbach did not disclose to Reetz her intention to conduct such examinations and did not request permission to do so. Thus, no reasonable jury could find that Reetz consented to the examinations. Defendants

argue that a reasonable person would have understood that by consenting to the interviews with the children, she also consented to their being examined. I disagree. First, Gresbach never specifically disclosed to Reetz the exact nature of her investigation, i.e., that it focused on whether Ian and Alexis had themselves been abused and was not an investigation of a more general nature in which Ian and Alexis might be witnesses. Second, both in common parlance and from the standpoint of the Fourth Amendment, an interview is different from a search and consent to interview does not constitute consent to search. From the standpoint of the Fourth Amendment, a brief detention of a child by an official for the purpose of conducting an interview is a seizure, Heck, 327 F.3d at 510, while the visual inspection of "those parts of [the child's] body usually covered by clothing" is a search. Darryl H., 801 F.2d at 900. And, in fact, in Darryl H., the Seventh Circuit emphasized the 'frightening,' 'humiliating' and 'intrusi[ve]' nature of an examination of a child's body remarkably similar to those that Gresbach conducted in the present case. Id. (quoting Terry v. Ohio, 392 U.S. 1, 24-25 (1968)). Thus, it is patently unreasonable to suggest that by authorizing Gresbach to talk to Ian and Alexis, Reetz implicitly authorized her to partially or wholly undress them.

The distinction between a brief detention to conduct an interview and a search becomes clearer upon consideration of the following hypothetical. Imagine Ian and Alexis as adults approached by a police officer lacking probable cause to arrest. The officer asks them if they will answer her questions about a narcotics investigation, and they agree. After conversing with Ian for a few minutes, the officer pulls up his shirt. Even more startling, after conversing with Alexis for a few minutes, the officer pulls up her dress and pulls down her stockings. No one would disagree that the officer acted beyond the scope of consent. The adult Ian and Alexis consented to a brief detention for the purpose of an interview, not to a search for narcotics, much less an under-the-clothes examination. The scope of consent analysis in the present

case is not different because Gresbach searched children too young to know that they did not have to allow her to look underneath their clothes. See Darryl H., 801 F.2d at 901 (stating that "a child of very tender years may not exhibit a subjective expectation of privacy in the same sense as an older child. He is, however, a human being, entitled to be treated by the state in a manner compatible with that human dignity.").

Defendants think it significant that plaintiffs failed to present evidence concerning Reetz's belief about the scope of her consent. However, as previously discussed, the scope of consent does not depend on Reetz's unspoken beliefs but on how a reasonable person would have interpreted her statements and actions. Jimeno, 500 U.S. at 251. Reetz neither said nor did anything that would lead a reasonable person to believe that she authorized Gresbach to examine Ian's and Alexis's bodies.

Thus, I find that Gresbach violated Ian's and Alexis's Fourth Amendment right to be free from unreasonable searches.

### 4. Whether Gresbach is Entitled to Qualified Immunity

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Alvarado v. Litscher, 267 F.3d 648, 652 (7th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Thus, after a court finds that an official has violated a constitutional right, it turns to the question of whether the right was "clearly established" at the time of the alleged violation. Id. The relevant, dispositive inquiry in determining whether a right is clearly established is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. It is not necessary that the very action being challenged has been previously held unconstitutional, so long as the unlawfulness was

apparent in light of existing law. Anderson v. Creighton, 483 U.S. 635, 640 (1987). The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. Jacobs v. City of Chi., 215 F.3d 758, 766 (7th Cir. 2000).

It would have been clear to a reasonable official at least by 2004 that under the circumstances in which it occurred, Gresbach's under-the-clothes examination of Ian and Alexis was unlawful. Thus, Gresbach is not entitled to qualified immunity. The Seventh Circuit announced in Heck that "the strictures of the Fourth Amendment apply to child welfare workers as well as to all other governmental employees." 327 F.3d at 509. And in language clearly intended to preclude future claims of qualified immunity for similar violations, the court stated that "it is patently unconstitutional for government officials to . . . seize a child attending [a private or parochial] school without a warrant or court order, probable cause, consent, or exigent circumstances." Id. at 517. Further, courts had already clearly established that for Fourth Amendment purposes, an examination of a child's body is a search, Darryl H., 801 F.2d at 900, and that the scope of government actions made lawful by consent is limited by the breadth of consent, Jimeno, 500 U.S. at 251. Thus, well before Gresbach examined Ian's and Alexis's bodies, it was clearly established that consent to a brief period of detention for purposes of an interview does not constitute consent to a search of the person, particularly an under-the-clothes search.

Defendants argue that Heck only established the law to be applied where a school administrator does not consent to a brief detention of a child pursuant to a child welfare investigation and that the scope-of-consent law applicable to the present case is uncharted territory. Defendants also present the affidavits of Gresbach's co-workers, setting forth their understanding of the law. However, neither defendants' argument nor the co-workers' affidavits are persuasive. Heck made clear that the Fourth Amendment applies to child welfare workers.

Heck also applied well-established judicial interpretations of the Fourth Amendment and did not modify them because social workers rather than police officers conducted the search. See id. at 513 (stating that the search of the school and the seizure of the child could only be upheld if they fell within one of the "'specifically established and well delineated exceptions' to the Fourth Amendment's warrant and probable cause requirements" and quoting Minnesota v. Dickerson, 508 U.S. 366, 372 (1993), and Schneckloth, 412 U.S. at 219). Thus, Heck put child welfare officials on notice that they are subject to the Fourth Amendment and to cases applying it. And Jimeno, 500 U.S. at 251, and its progeny put officials on notice that government action made lawful by consent is limited by the breadth of consent. That Gresbach's co-workers may not be familiar with such decisions does not make them less clearly established.

As previously indicated, to show that law is clearly established, plaintiffs do not need to cite a specific scope-of-consent case in which a government official obtained consent for a brief detention and interview and then searched the detainee underneath her clothes without further consent. See Anderson, 483 U.S. at 640; see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (stating that "fundamentally similar facts" are not necessary to a find that a rule of law is clearly established). And that plaintiffs have not found such a case is not surprising. Rather, based on the general principles of the law of consent, it is immediately apparent that consent to an interview, even for the purpose of investigating a report of abuse, does not amount to consent to a beneath-the-clothes search. Thus, under Heck, Darryl H., and Jimeno, a reasonable official would have known that she lacked consent to conduct such a search.

**B.     Due Process Claims**

Plaintiffs also contend that defendants violated their rights to substantive and procedural due process, and defendants move for summary judgment on such claims. In Heck, the

Seventh Circuit found that the plaintiffs established violations of substantive and procedural due process. 327 F.3d at 524, 527.[6] The court's analysis suggests that the viability of such claims depends at least in part on the existence of a Fourth Amendment violation. See id. at 520-27.

In the present case, relying on their contention that Gresbach did not violate Ian's and Alexis's Fourth Amendment rights, defendants have not independently analyzed plaintiffs' due process claims. However, I have now found a Fourth Amendment violation, albeit one that differs somewhat from that found in Heck. In any case, defendants have not stated enough to prevail on their motion. Further, in light of the present decision, the parties may wish to revisit the due process claims. Therefore, I will deny defendants' motion for summary judgment with respect to such claims without prejudice and permit the parties to file additional material if they wish.

## C.    Remaining Claims

Plaintiffs assert official capacity claims against defendants, seeking injunctive and declaratory relief with respect to those claims.[7] Defendants argue that I lack jurisdiction over

---

[6]With respect to substantive due process, the court found among other things that the defendants had violated the plaintiffs' rights to familial relations by conducting a custodial interview of the minor plaintiff without notifying his parents or obtaining their consent and by targeting the parents as child abusers without reasonable suspicion. Heck, 327 F.3d at 524.
With respect to procedural due process, the court found that the defendants had violated the plaintiffs' rights by:
> (1) failing to obtain a warrant or court order before searching the church and seizing the minor plaintiff; (2) interrogating the minor plaintiff without first notifying his parents or obtaining their consent; and (3) investigating the parents for child abuse and threatening to remove their children without definite and articulable evidence giving rise to a reasonable suspicion that the parents had abused the children or that the children were in imminent danger of abuse.

Id. at 527.

[7]Plaintiffs assert that defendants Robinson and Nelson failed to train MCW employees and set policies to prevent Gresbach and other employees from taking unconstitutional action.

plaintiffs' additional federal law claims because plaintiffs fail to establish a threat of injury sufficiently immediate to make their request for an injunction justiciable.

In order to establish jurisdiction, plaintiffs must allege a case or controversy within Article III of the Constitution. <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101 (1983). To obtain an injunction or declaratory judgment, they must establish that they face a threat of future injury that is both real and immediate. <u>Id.</u> at 101-02. Plaintiffs cannot establish a real and immediate injury merely by proving past exposure to illegal conduct, though past wrongs may be evidence bearing on whether there is a real and immediate threat of being exposed to such conduct again in the future. <u>Id.</u> at 102. In <u>Lyon</u>, the plaintiff sued the City of Los Angeles after police used a "chokehold" on him during a routine traffic stop, alleging that such force was unconstitutionally excessive. <u>Id.</u> at 105. The Supreme Court held that he had not shown sufficient evidence that he would be unreasonably subjected to a chokehold a second time and that his claim was therefore not justiciable. <u>Id.</u> at 108. It noted that even assuming that Los Angeles police regularly place citizens in chokeholds, the plaintiff was only one man in a large city and thus the odds were against police again placing him in a chokehold. <u>Id.</u>

Thus, for plaintiffs in the present case to establish justiciability, they must show that defendants are likely to search or authorize a search of Ian and Alexis a second time unless I enjoin them from doing so. Plaintiffs have not met their burden. As such, I lack jurisdiction over their official capacity claims for declaratory and injunctive relief and will dismiss them.

Finally, I will also dismiss plaintiffs' supplemental state law claims. Plaintiffs appear to have conceded that I lack jurisdiction over their state claims for damages because they failed to properly serve the state attorney general as required by Wisconsin law. And Wisconsin law on standing to seek prospective equitable relief mirrors federal law. See <u>Fox v. Wisconsin Dept. of Health and Social Services</u>, 112 Wis. 2d 514, 525 (1983).

Because I have dismissed all claims for equitable relief and plaintiffs' claims against Gresbach's superiors, defendants Robinson and Nelson, exclusively seek equitable relief,[8] I will dismiss Robinson and Nelson from this action and will not address the merits of plaintiffs' claims against them alleging failure to train and failure to set policies to prevent constitutional violations.

## IV. CONCLUSION

Therefore,

**IT IS ORDERED** that plaintiffs' motion to strike is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, as stated herein.

**IT IS ALSO ORDERED** that plaintiffs' motion for partial summary judgment is **GRANTED**.

**IT IS ADDITIONALLY ORDERED** that defendants Denise Revels Robinson and Helene Nelson are **DISMISSED** from this action.

Dated at Milwaukee, Wisconsin, this 19 day of March, 2007.

/s_____
LYNN ADELMAN
District Judge

---

[8]Indeed, the Eleventh Amendment would bar plaintiffs from seeking damages from Robinson and Nelson in their official capacities.